argument not to exceed 15 minutes per side. Mr. Richard Everett Collins, you may proceed for the appellant. Thank you. If the court please, I would like to reserve four minutes for rebuttal. All right. May it please the court. This is a fact intensive case involving the rights of pretrial detainees to adequate medical care. On June 29, 2016, Tammy Brawner was booked into the Scott County Jail by the jail administrator, Captain Glendara Tucker. Tucker conducted what state law refers or calls a receiving medical screen. It's essentially a series of of questions meant to identify those inmates in need of reasonably prompt medical attention. Those email those inmates with serious illness, comatose state or who come into the jail with, quote, prescribed medications through the receiving medical screen. Captain Tucker learned that Brawner was prescribed and taking three medications. Suboxone, gabapentin and clonazepam. Now, all three of these medications which were prescribed to Mrs. Brawner are controlled substances. And at trial, the uncontroverted medical testimony, both from the emergency room physician who later treated Miss Brawner and as well as our own retained correctional health care expert, Dr. Hagerty, testified that it is highly dangerous to abruptly discontinue any of these medications, whether individual, individually or collectively. In fact, Dr. Clark described it as inhumane. But Scott County has an official, albeit unwritten, but certainly admitted and stipulated to blanket policy against administering or continuing any controlled substances, whether they're prescribed or not. So as a threshold matter, Miss Brawner was not going to get any of these these particular medication at the jail. And now I think that is a problem. A blanket ban like this. First of all, because it serves no penological interest or any penological interest of not having controlled substances can easily be allayed by controlling the controlled substances. But never mind that for now. Yes. So it's kind of a funny case because you dismissed all the individual defendants, I think we did. So to prevail against the county, do you have to show you have to show some individual wrongdoing right by individuals? I mean, there's no individual wrongdoing. The county can't be liable. Well, I'm not so sure of that, but I will say this, that the record is replete with evidence of individual wrongdoing. And that's true whether we're talking about a pre Kingsley standard of deliberate, intentional, reckless indifference, or if we're talking about what we're urging the court to do, which is to to extend Kingsley to to all pre-trial detainees. But to your point and to your question, it has always been a vague, vague to me in law, whether or not you do have to prove that individual wrong, wrongful behavior, because think of a failure to train case, for example, where you're not going to have some individual actor a lot of the times deliberately doing something, something wrong. Instead, what they're doing is exactly what they've been trained to do. And here we get a lot of that. Now, I think the record will show that there is, in fact, that type of mens rea, that deliberate indifference that the district court was was was looking for and which it overlooked. But I'm not so certain that where you have a policy like this ban that that works a constitutional injury, whether or not you have to go the extra mile of showing some, whether it's subjective or objective, deliberate indifference. But I want to ask you about the Kingsley point. But before we just wrap up this point, what's your best case that says that we can even if there's no individual wrongdoing, we can still find the county liable. So I think that the Gregory case, Gregory versus Louisville, which describes in the context of a failure to train, I don't see any logical reason why a failure to train case would be any different here. Because what you what you have at bottom is officers following exactly what they're what the county is telling them to do. So, but going back to this ban, and I'll tell you why I think it is so troubling here. It's because there is there is it's one thing to have a ban of controlled substances. And then to have the jail have some sort of method for determining how we can wean somebody off of these controlled substances or how that whatever condition it is can be treated in some reasonable way. But in Scott County, you're not going to get that because number one, despite the written policies of the county which would require a medical personnel to participate in the receiving screening. It's Scott County's established policy that they just don't do that. Okay, so you don't have anybody on the front end at at the medically trained screening inmates and well that might be well and good so supposedly they could screen them within a day or so. But the problem here is also I guess to to in order for you to prevail, you have to show that the, your class constitutional rights were violated. And then you also have to show that that violation was pursuant to some county policy or custom. So, just to be clear, what is the policy or custom of the county that that you would identify here. There's really three, and I think they work in concert, and Miss Bronner was a victim found at the confluence of all three but one is the ban on controlled substances which sets the stage to is that we don't leave before you leave that What do you mean by ban on control substances. The jail has the jail stipulated a trial that they have an outright blanket ban on any controlled substances, being administered or continued in the jail so if an inmate comes into the jail on suboxone which is an opioid withdrawal treatment. And by the way, we're in Scott County, Tennessee, which, which is a place that's just, just what are you saying that includes prescribed medication. Yes, it does. It absolutely something in there. Is there a written policy that states that it's not a written policy but it's stipulated, and, and it's it's stipulated in the record, I can't find the stipulation number that that's part of the pre trial order. And of course that's what the defense the defendants argued like it was no big deal, but at the end of the day you've got finance that's policy number one is this, this blanket ban on controlled substances, even if the prescribed and I can tell you our, our expert, Dr. Just turn that one upside down and inside and out because he's worked at plenty of jails where you do administer controlled substances, all you got to do is control them. The other policy is not involving medical personnel during the receive the receiving screen. Now this is against Scott County's own written policy, which would require medical personnel to be called in, in the event that somebody is it is an inmate is indicating either serious illness. A comb to state or prescribed medications, but in reality they don't do that. Okay, here's what they actually do which becomes our third policy or customer, the state of Tennessee, their minimum requirements. Within 14 days of entering the jail, and then being booked into a jail, the state requires that the jail conduct a full on medical physical. Okay. Now that's for all inmates, that's not just for the inmates who come in on controlled substances or with diabetes or any other problem that's every single inmate that enters the jail. And so what happens here in Scott County and frankly it happens at these, these counties all around here in East Tennessee, is that becomes now the touchstone for the county, as long as they're complying with this 14 day thing as long as they can show the state. That they that each inmate was seen within that 14 day window. That's all they care about. But what happens is, because there is no protocol, there's no way there's no check on this inmates like Tammy brawner will come in there with prescribed medications and won't see a doctor or any healthcare professional for 610, all the way up to 14 days. And even Captain Tucker who's the jail administrator and quite frankly probably a final policymaker for 1983 purposes says, Yes, this, this, this policy results in the untimely administration of medical attention. Council. These three policies, you, you mentioned, which of them have, which of them are in writing, and we're in the record. Can we find the, the relevant writing. Okay. The, the first. The band is not in writing that's a stipulation. Okay, but it's stipulated say is stipulated you mean isn't an oral stipulation of some kind. Is that what you're saying, I'm saying the party stipulated to it in the pre trial order. What's in the pre trial. So if we look at the pre trial order we'll see this in there. Yeah, yeah, yeah. I will say, I will say this, though, the pre trial order says ban on narcotics that was cleaned up at trial to be controlled substance substances because that's really what it is and that you can find that on day one of trial, before we even started opening the argument, but you'll find up. You'll find the other pieces that exit trials of 57 I see I'm out of time. If I may. Yeah, you can finish the answer. Exhibit 57 which has your forms, which also directs the booking officer to seek medical attention. And then I believe it's exhibit. So I don't want to take up any more time but there is the medical services plan is in the record, and I just cannot find the exhibit number now and I apologize. I just have. Are you saying that even if this form had had not been misplaced. She still wouldn't have seen somebody for 14 days. I didn't hear the first part of your question. Judge right. My understanding is that this form. Sorry, was misplaced and didn't get directly to the nurse. Yeah. Are you saying that even if it had not been misplaced. Nothing would have been done for 14 days. Yes, I am. I am saying that because there is no other written policy that requires any in any interaction between inmate and and healthcare, whether it be a licensed practical nurse which is the reality or, which is what's really complicated contemplated by the regulations which is a physician but no that is the policy. And so that's that's what Scott County is concerned with doing is making sure that when the state comes in and inspects this jail they can show that inmate was booked in on x date, and got their physical. Can I ask you a bit before you go do you do you agree you have to prove more than negligence. Yes, I think. What do you have to prove. I think that what I have to prove is stated. Succinctly, and the Bruno second starting case applying Kingsley and and quoted in. Recently, in life, or laws versus Franklin County which is a eastern district of Kentucky case of published opinion that what I have to prove is that the defendants recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pre trial detainee, even though the defendant official knew, or should have known that the condition posed an excessive risk to health or safety. So it is something, it's something more than negligence, but it's not that type of almost criminal subjective intent that we're so used to seeing in these cases, and you're saying that's it by operation of Kingsley. Yes. And what about the county itself. I mean, the court faulted you for, for not showing prior instances where this known narcotics policy or no construction, no controlled substance policy resulted in a problem. Yeah. My response to that is I don't know how the court would, I believe the court there is confusing the district court is confusing policy and custom. You know, when you're trying to establish a long standing custom it's often helpful to show other cases where this has happened, and it's turned and it's turned south, but that's by no means a requirement. And here we have an official policy one that's even stipulated to that's working, the constitutional injure. All right, why don't we hear from other opposing counsel. Thank you. Thank you. Please the court. My name is Caitlin Burchett and I represent defendant appellee Scott County and we are respectfully requesting that you affirm the decision of the district court in this matter. Taking plaintiff's issues, as he presented them in the briefs we have first like to discuss the issue of what needs to be proven in order to reach what standards should be applied here is it the deliberate indifference to prong tests that we are used to in these denial of medical care cases, such that requires a subjective objective component, or is it something else. While Council did make a detailed argument as to switching the standard. There's nothing in the record that would warrant that yes there's been discussion in dicta and in footnotes about the application of Kingsley, and how it could in fact change it. But as it stands, this circuit has not determined that the subjective objective standard is inappropriate. In fact, on May 1 of this year in Hicks v Scott. This court analyze a pretrial detainee denial of medical care case objective and objective standard. As such, we would assert, then that of course as this court has held numerous times that the subjective and objective standard of the two part test is the proper standard to be used here. And further, you know, citing your own rules, the Sixth Circuit rule 32.1 section B says that this panel is bound to uphold the published opinions prior helps opinion until there is a determination against it by the Supreme Court, or an en banc hearing and none of those I have found is in play here. So taking it with the subjective and objective standard. We would then turn to the second issue regarding the courts. God is that a published case from published case. What was that judge Wheeler versus Scott was that a that's a that's on your briefs I take it. No, it was just came out my first it's published. I have it somewhere. I cannot find the citation for you right now but I did see it was published in public. I did see that thing on the citation for that is 958 f 3d for 21. Does it expressly reject applying Kingsley. It does not expressly rejected it goes over the discussion of it, giving officers qualified immunity but again it's still applying the same continuous standard of the objective and subjective tests. Anything further. Not as to that point your honor Do you have any other questions regarding the standard. Not at this time. Okay, then turning to the case at bar. We would assert of course that the district court did not air and determining this in order to prove municipal liability, a plaintiff must show first their constitutional rights were violated, and that the policy or custom of the municipality was the moving force behind it. We would assert that plaintiff Miss Bronner cannot show that her constitutional rights were violated. We believe that she has to show that some individual did violate her constitutional rights regardless of the fact that the individuals were dismissed out of this case, but counsel. I'm sorry let's talk about that. Let's say you have a this policy that says we that no narcotics can be given, even, even if it is prescribed by a doctor. And you have no particular defendant can be found to have subjectively understood the harm or that, you know, to have intended the harm. So, why wouldn't it be possible to have a violation, if the policy itself is responsible for an unconstitutional situation. Well, I think there are certain situations where, you know, if you argue that it was facially unconstitutional, then yes, there can be that situation where the policy in and of itself can result in a constitutional violation. However, with this one there are two points I would like to make. First, during the trial of this matter and until the plaintiff's reply brief, they never made the assertion that this was a facially unconstitutional policy. They said it was unconstitutional as applied. And so we would assert that, you know, he didn't make the jump that this was on its face unconstitutional because narcotics in and of itself, or controlled substance, however you want to word it, are inherently very dangerous in a jail population. They can cause, be the root of fights and violence and things like that. And so sometimes, you know, maybe not in the case of Ms. Brawner, but a jail doctor could look and prescribe something that is not a controlled substance and substitution for that. So I don't think it's straight application. Okay, so she's making an as-applied challenge, but that didn't happen here, right? No, it did not. So there was no substitute. And as far as we know, there's no corollary requirement that a doctor find a substitute that goes alongside your no-control substances. It's not no-control substances, but a medical doctor will find an alternative suitable to your condition. It's just no-control substances. Correct, but I think if you deem the medication necessary, then the doctor would strive to find a corollary for it. You know, here we never heard evidence as to why Ms. Brawner was prescribed these medications. Her treating physician would never testify at the trial saying, yes, Ms. Brawner took these medications for X, Y, and Z or to prevent seizures or whatever. It was just stated that she was on these medications. And she had several numerous prior bookings where the medications vary every single time it's taken. But what about the testimony that it doesn't, in effect, it doesn't matter why you're taking it, you never take these substances away cold turkey without something else? Well, that was actually somewhat contradicted as well by plaintiff's own expert, Dr. Hagerty, who admitted to stopping the treatment of gabapentin on one of his own patients without properly tapering them off. When she originally was booked or checked into the facility, did she inform the medical staff that she suffered from seizures? No, I do not believe that was on her booking sheet at that time. And can you read, I mean, she did receive medical treatment at various times. Can you give us a brief summary of the medical treatment she did receive? Because it's not as if she was never seen by doctors or never prescribed any medication, I don't think. That's correct. Ms. Brawner did have a series of seizures throughout her stay in the Scott County jail. We are not denying that at all, but we are asserting that she did receive treatment. I believe she was on July 7th, I think in the early morning, she was, it was notified that she was having seizures and she was transported to the emergency room. I believe a fall at medical center where she was given medication, treated and then returned to the jail. Following that return to the jail, Ms. Brawner was checked on by nurse Massengale. And I believe that is where they prescribed, I wanted to say they wanted to prescribe phenobarbital and nurse Massengale relayed that message to Dr. Caporelli, the jail doctor, and had it be switched to Dilantin instead. So there is some medical treatment going on. Furthermore, Ms. Brawner did have her 14 day physical done. So again, she did see nurse Massengale then she was able to check on her status and things like that. When Ms. Brawner was having seizures on July 11th, correctional officer Amy Nicely called Dr. Caporelli and asked what to do and he instructed to give her another dose of the Dilantin. And then on July 17th, when Ms. Brawner was again having, or July 15th, I apologize. When Ms. Brawner was again having multiple seizures, nurse Massengale was in there with her monitoring the duration of the seizures, checking her pulse, checking her heart rate, calling Dr. Caporelli, who instructed to give alphoric acid to try and abate the time of these seizures and ultimately determined that Ms. Brawner should once again go to the emergency room. So yes, your honor, she did receive medical treatment throughout her stay. Counsel, something in the record isn't clear. There's some reference to a 6 a.m. seizure, one of these days, and then a 7 a.m. seizure when she was given the Dilantin. Were there two seizures? I think you're referring to the July 15th seizures. And I do believe there was one that was noted in the tower. And then there was a 7 a.m. seizure. Yes, she did have multiple instances of having seizures. So nothing was done. There's no record of anything being done in response to the 6 a.m. seizure. Is that right? Correct. And why would that be okay? Well, I don't think it's okay, per se. And I would never try and assert that, you know, letting someone seize by themselves in a jail cell is okay. But in this one instance, it doesn't note how long the tremors were, you know, later on in the afternoon. They were going from 15 to 45 seconds. So it may not have been a prolonged seizure. I don't think it would amount to a deliberate indifference by any medical staff because it was noted and passed along to the nurse when she came in that morning on shift. And what is your response to the assertion that having a policy of no controlled substances without a corollary policy of giving something instead is recklessly indifferent and violates the right to medical treatment? Well, I think that there are multiple reasons why people could be on controlled substances. And so to blanketly assert that not having access to a controlled substance would be recklessly indifferent would be incorrect in that assertion just because. I'm saying as applied. As applied to the facts of this case, you know, I think that there needed to be more investigation as to why Miss Brawner was on the medications. Again, there are multiple reasons that you can be on gabapentin or clonazepam or suboxone or things like that that aren't discussed. We never heard why her medical history noted in her booking sheets on the jail, which were exhibits, I believe, in the trial record show various medications at various times. So it's hard to tell what was a necessary medication. Why wasn't it? Why wasn't it a question of fact? I mean, why was it proper just to grant judgment to the defendant? Well, I think the court just looked at the fact, you know, taking into account, I believe it's Gregory and some of the others that say you have to have that underlying individual constitutional violation and then go to it. And it doesn't really show that what happened to Miss Brawner was deliberate indifference. Yes, it might be negligent, but I don't believe that this rises to the level of deliberate indifference as to medical needs because she did still receive medical care for the. If you want to say, but possible side effects during that time period. Thank you. Does that complete your argument? Well, I was going to go into a little bit more. I wasn't sure if you had any more questions for me at this time. But again, you know, we would talk about the four policies raised by counsels asserting the the policies that he pointed out as being unconstitutional. First, I would note that the screening process issue that was raised, it wasn't ever fully raised in the way that he has raised it in his briefs. And so I would say that that one is improperly before the court. Judging on the other three policies, you know, I would assert again, this defendant would assert that you still have to show the prior notice aspect of these policies, having some. Issue some implication to put these this county, this defendant on notice that this policy was not being implemented, and it was being implemented in a way that could result in harm. And that hadn't happened here. They didn't know that the policies as implemented and the ones that started by plaintiff resulted in any harm because this is the first instance of that conduct. So at this time, if you have no more questions for me, that ends my argument. All right. Thank you. Yes, Your Honor. A few points. First, Hicks v. Scott bears no similarity to this case. The case doesn't mention Kingsley. It doesn't involve medical rights. And in fact, I believe it involved excessive force under the Fourth Amendment that may have even been a convicted prisoner in that case. But the case has no bearing on this case. It's completely an opposite. What do you make of Richmond v. Huck? I think that Richmond v. Huck is a good example of a litigant not properly raising an argument. In Judge Donald's opinion, you know, she drops the footnote and she says this. It's not before us. Nobody's raised it. But this this this idea of lumping convicted persons in with pretrial detainees for purposes of medical rights cases. And that's been called into question by Kingsley. So it just wasn't right. Are we bound by Supreme Court decisions, whether you whether counsel cites them or not? That may be so. And I think you're bound by Kingsley. I mean, there's no there's nothing. To the extent that Kingsley changed our law, wouldn't we have been bound by that in Richmond yet we continue to follow our prior precedent? Well, I don't think that the logic of if it's not raised, then I don't see how how how the court can go out of its way to make arguments for attorneys that didn't raise it. It would be quite odd for us to entirely ignore or ignore jurisprudence in a death penalty case because somebody didn't cite a case. So it just seems to me we'd be bound by it. And we did we did reference it there and we didn't change our rule. Well, this is the court. This panel has the opportunity to do it now and join the second, ninth and seventh circuits and any other. And there's no other circuits besides those three that have actually really grappled with this. Well, aren't there still a couple of circuits that haven't changed their role even even after even in light of Kingsley? They mentioned Kingsley in footnotes and they skirt around. They find a I shouldn't say skirt around, but they find a way not to address it squarely because of whatever the issue was in the case. It just wasn't dispositive of the case in all three of those cases from the 5th, 11th. And I think there might be two Fifth Circuit cases that are cited in the brief that just drop footnotes and and say, oh, well, we don't think it applies. And it really, really wasn't argued. Let me let me if I may hit on the other the other points I wanted to make. And that is counsel's real concession that there needs to be some sort of investigation going on to figure out why. If you don't have a corollary policy that requires there to be some sort of reasonable substitute in place, then you've got to do something. You've got to have a medically trained physician or someone in there assessing why is this medication prescribed? What is the danger of a withdrawal in acute setting? And if you can't do it in the jail setting, you got to let them out. It's a pretrial detainee. And that's eventually what they did anyway. But it was too late. My client had already suffered brain damage. And on the day in question, July 15, when the seizures start at six, there were nine seizures by the time that that EMS was even called. OK, when when the when my client came back from and I may be out of time when my client came back from the hospital on July 7th, there was a directive in the discharge instructions to see a physician within one to two days. You've got to see a physician within one to two days. And what does Nurse Massingill do? She does not ensure that that Miss Bronner sees a physician again for that investigation. It needs to happen to figure out why. What is going on with this inmate? And number two, Haggerty doesn't either. And he's the medical director who shows up at the jail once a week to do these 14 day physicals. So he doesn't even see her. They just completely ignore the hospital's discharge instructions. And thank you. We ask that the court reverse and remand this case for trial. All right. Thank you very much. And the case is submitted. Thank you.